# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

United States of America v.

JEFFREY R. JONES a/k/a
JEFFERY JONES,
DOB: XX/XX/1984

)
)
)
)
)
)
)

Case No.  20-984M(NJ)

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ 2/3/20 - 7/8/20 _____ in the county of _____ Milwaukee _____ in the
Eastern District of Wisconsin , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) | Distribution of controlled substances |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

*Complainant's signature*

Christopher Farrell, FBI Special Agent
*Printed name and title*

Sworn via telephone; transmitted via email
pursuant to Fed. R. Crim. 4.1

Date: _____ July 15, 2020 _____

*Judge's signature*

City and state: _____ Milwaukee, Wisconsin _____

Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND ARREST AND SEARCH WARRANTS

I, Christopher Farrell, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for (1) a criminal complaint and arrest warrant for **JEFFREY R. JONES**, a/k/a **JEFFERY JONES**, (DOB: XX/XX/1984); and (2) a warrant, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search  the premises known as ████████████ ████████████ hereinafter referred to as "**PREMISES 1**," and ███████ ████████████████████ hereinafter referred to as "**PREMISES 2**," both **PREMISES** further described in Attachment A, for the things described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation and have been since August of 2008. I have been assigned to the Southeastern Wisconsin Regional Gang Task Force since September of 2019. I was previously assigned to the Louisville and Pittsburgh Field Offices. Prior to being employed with the FBI, I was a police officer for approximately six and a half years. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by the law to conduct investigations of and to make arrests for federal felony arrests.

1

3.     As a Special Agent, I have attended training courses that specialized in the investigation of narcotics trafficking and money laundering. I have also participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of individuals and the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. Additionally, I have spoken with other experienced narcotics investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become aware of the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am also familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. More specifically, I am familiar with the street names of various drugs, including marijuana, heroin, cocaine, and cocaine base. I am familiar with methods that are commonly used by drug dealers to package and prepare controlled substances for sale in the State of Wisconsin and elsewhere.

4.     As a narcotics investigator, I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone and financial records, and the arrests of numerous drug traffickers. I have worked with numerous informants in the investigation of drug trafficking in the State of Wisconsin and

2

elsewhere. I have directed informants during controlled buys of controlled substances, performed undercover meetings with individuals, and made monetary payments to drug traffickers for past controlled substances received. I have participated in the execution of numerous state and federal search warrants in which controlled substances, drug paraphernalia, drug proceeds, drug-related records, financial records, and electronic devices with data were seized. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such. I also know that it is common for drug traffickers to use their vehicles to store, secrete, and otherwise possess various indicia of drug trafficking. I have also been the affiant of many search warrants. I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances.

5.     In the course of my employment and experience, I have also become aware of techniques and practices used by narcotics traffickers to avoid detection by law enforcement. Examples of those techniques include the use of multiple locations to conduct narcotics related activities, the use of counter-surveillance, the use of hidden compartments in vehicles to conceal narcotics and currency, the use of mobile telephones, voice mail, texting, instant messaging, email, the compartmentalized use of multiple telephones, and the use of numerous associates

3

and "workers" to further their criminal organization.  I have also become aware of the various techniques individuals use to conceal the source or nature of drug proceeds.  Examples of those techniques include the purchase of assets and financial instruments in nominee names using cash and "structuring" transactions to avoid certain reporting requirements of financial institutions.

6.      Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).  Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware and software which are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

7.      To this end, based upon my training and experience, I know that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances. I have also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.  I also believe that it is common for crime suspects who possess illegal controlled substances and firearms to often

4

take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and firearms that they control, possess, buy, and sell.

8.      The facts in this affidavit come my personal observations, my training and experience, my review of oral and written reports of other law enforcement officers participating in this and related investigations, records, documents, and other evidence obtained during this investigation. The investigation to date has involved traditional law enforcement methods, including, but not limited to confidential informants, interviews, documentary evidence, phone analysis, and physical surveillance.

9.      The facts in this affidavit come my personal observations, my training and experience, my review of documents, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

10.     The United States, including the FBI and the FBI's Southeastern Wisconsin Regional Gang Task Force, are conducting a criminal investigation of **JEFFREY R. JONES,** a/k/a **JEFFERY JONES**, (date of birth: XX/XX/1984) regarding possible violations of Title 21, United States Code, Section 841(a)(1) (distribution of and possession with intent to distribute controlled substances).

5

### A. Confidential Source #1

11.     In January 2020, case agents interviewed a confidential source (CS #1). CS #1 stated "R.J." is a Gangster Disciple gang member who is selling heroin and fentanyl. CS #1 indicated CS #1 purchased narcotics from R.J. in the past and would be able to purchase narcotics again from R.J. CS #1 indicated R.J. drives a black Nissan Maxima with Illinois plates. CS #1 indicated R.J. was currently in possession and known to use phone number ▮▮▮▮▮▮▮▮ the ▮▮ Phone, to facilitate illegal narcotics transactions. A case agent showed a single Milwaukee Police Department booking photograph of **JEFFREY R. JONES**, a/k/a **JEFFERY JONES**, (date of birth: XX/XX/1984) to CS #1. CS #1 positively identified the photograph as the person CS #1 knew as "R.J."

12.     On February 3, 2020, case agents interviewed CS #1 again. CS #1 stated CS #1 has purchased fentanyl from **JONES** since 2015. CS #1 has purchased a minimum of 10 grams of fentanyl at least 40 times since 2015. CS #1 advised CS #1 has purchased 70 grams of fentanyl between seven and eight times. Overall, CS #1 believed CS #1 purchased half a brick, or half of a kilogram, of pure fentanyl from **JONES** since 2015. CS #1 advised **JONES** has been using the ▮▮▮ hone for the last three to four years.

------

[1] Phone number ▮▮▮▮▮▮ is subscribed to **JEFFREY JONES** with address ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

6

13.     Case agents believe CS #1 is reliable and credible. First, CS #1 has provided information and cooperated with law enforcement since October 2019. Second, CS #1's information is consistent with case agent's knowledge of violent gang subjects in Milwaukee, Wisconsin. Furthermore, substantial portions of CS #1's information has been corroborated in other gang investigations by controlled drug purchases, consensually recorded phone calls, as well as through independent investigation, including surveillance and information from other sources.

For these reasons, case agents believe CS #1 to be reliable.

**B.     Controlled Purchases of Controlled Substances from JONES**

14.     Based upon my training and experience, I know that a "controlled buy" (and/or controlled contact) is a law enforcement operation in which a confidential source purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a confidential source is used, s/he is searched for contraband, weapons, and money before the operation. The confidential source is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the confidential source meets cases agents at a pre-determined meet

7

location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The confidential source is again searched for contraband, weapons, and money. A sample of the suspected drugs is then field tested by case agents for the presence of controlled substance and then placed in inventory pursuant to normal inventory procedures. Telephone calls to the target by the confidential source are consensually recorded calls under the direction and control of case agents and made in the presence of case agents.

**1.    February 3, 2020, Controlled Purchase of Heroin**

15.    On February 3, 2020, CS #1 arranged to purchase heroin from **JONES**. CS #1 advised CS #1 was successful in setting up a heroin purchase of approximately 45 grams for $4,100 from **JONES**. CS #1 advised **JONES** was waiting for CS #1 to call him to meet and conduct the transaction. CS #1 made a consensually recorded phone call to the ▨▨▨Phone, and **JONES** answered the phone. CS #1 and **JONES** discussed meeting, and **JONES** told CS #1 to meet him at the Popeye's restaurant located at 1567 W. National Avenue in Milwaukee, Wisconsin. Next, case agents provided CS #1 with a recording device and a total of $4,100 pre-recorded money for the controlled purchase. Case agents established surveillance in the area and observed CS #1 park in the parking lot. Case agents observed **JONES** arrive in the parking lot driving a Nissan Maxima and park behind CS #1. CS #1 entered **JONES'** vehicle from the front passenger side and then exited shortly thereafter. **JONES** was then observed exiting his vehicle and

8

approaching CS #1 at CS #1's vehicle and engage in what appeared to be a verbal confrontation. **JONES** then returned to his vehicle and left the parking lot.

16.     Case agents met and debriefed CS #1 after the narcotics purchase from **JONES**. Case agents seized the suspected heroin and the recording devices. CS #1 indicated CS #1 arrived in the parking lot and called **JONES** at the ▓▓▓▓ Phone to notify him that CS #1 was waiting in the parking lot. CS #1 observed **JONES** arrive in the parking lot in the black Nissan Maxima and entered the front passenger seat of **JONES'** vehicle. CS #1 provided **JONES** $4,100 in cash, and **JONES** handed a clear plastic sandwich bag from the center cup holder containing a grey rock-like substance. CS #1 exited the vehicle and returned to CS #1's vehicle when **JONES** approached CS #1's driver side door. **JONES** was upset because he believed CS #1 owed him $300. **JONES** then returned to his vehicle and left the parking lot. CS #1 believed **JONES** was keeping narcotics at a nearby storage unit because it takes **JONES** a longer amount of time to arrive at a narcotics transaction when he lives very close. **JONES** also told CS #1 he had to go out of town, which CS #1 believed meant that **JONES** needed to get more narcotics, most likely from Chicago or Detroit.

17.     Case agents field tested the suspected heroin, which yielded positive results for the presence of heroin and fentanyl, and weighed approximately 44.22 grams. A case agent reviewed the video of the narcotics transaction and determined it was consistent with CS #1's statements regarding the narcotics transaction. A

case agent also positively identified **JONES** as the individual who met CS #1 in the parking lot to conduct the narcotics transaction.

### 2. March 14, 2020, Controlled Purchase of Fentanyl

18. On March 14, 2020, CS #1 arranged to purchase fentanyl from **JONES**. CS #1 advised CS #1 was successful in setting up a $2,000 fentanyl purchase from **JONES**. CS #1 attempted to make a consensually recorded phone call to the ▮▮▮ Phone, but **JONES** did not answer. Moments later, CS #1 received a phone call from **JONES**. During the consensually recorded phone call, CS #1 and **JONES** discussed meeting, and **JONES** told CS #1 to meet him at the Popeye's restaurant located at 1567 W. National Avenue in Milwaukee, Wisconsin. Next, case agents provided CS #1 with a recording device and a total of $2,000 pre-recorded money for the controlled purchase, and then established surveillance in the area of 1567 W. National Avenue in Milwaukee, Wisconsin. Case agents observed CS #1 park in the parking lot. After almost 40 minutes, case agents observed **JONES** arrive in the parking lot driving a dark colored Audi and park behind CS #1. **JONES** exited the front driver side of the Audi and entered CS #1's front passenger side. Moments later, **JONES** exited CS #1's vehicle, returned to his vehicle, and left the parking lot.

19. Case agents met and debriefed CS #1 after the narcotics purchase from **JONES**. Case agents seized the suspected fentanyl and the recording devices. CS #1 indicated CS #1 contacted **JONES** via phone and notified him CS #1 was waiting

10

at the meet location. CS #1 stated CS #1 received a text message from **JONES**, using the ▮▮▮Phone, stating that **JONES** was on his way and that he'd be there shortly. CS #1 observed **JONES** arrive in the parking lot in an unknown vehicle and enter CS #1's front passenger seat. **JONES** removed the fentanyl from his front right pant pocket and placed it near the center console as CS #1 provided $2,000 in cash to **JONES**. CS #1 stated **JONES** exited the vehicle and entered the vehicle that he parked behind CS #1 and leave.

20.     Case agents field tested the suspected fentanyl, which yielded positive results for the presence of fentanyl, and weighed approximately 10.03 grams. The fentanyl was double bagged, meaning it was packaged in two sandwich bags. Based on my training and experience, I believe that this suggests **JONES** is aware of the fatal effects fentanyl may have if touched or inhaled. A case agent reviewed the video of the narcotics transaction and determined that it was consistent with CS #1's statements regarding the narcotics transaction. A case agent also positively identified **JONES** as the individual who met CS #1 in the parking lot to conduct the narcotics transaction.

### 3.     May 1, 2020, Controlled Purchase of Heroin

21.     On May 1, 2020, CS #1 arranged to purchase heroin from **JONES** for $4,500. At the direction of case agents, CS #1 made a consensually recorded phone call to the ▮▮▮Phone, and **JONES** answered the phone. CS #1 and **JONES** discussed meeting to purchase controlled substances, and **JONES** told CS #1 to

meet him at the McDonald's restaurant located at 1575 W. Washington Street in Milwaukee, Wisconsin. Next, case agents provided CS #1 with a recording device and a total of $4,500 pre-recorded money for the controlled purchase. Case agents established surveillance in the area of 1575 W. Washington Street in Milwaukee, Wisconsin.

22.     Case agents conducted surveillance and observed a white Infinity XQ80 parked outside the address of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ **PREMISES 2**. Case agents observed the white Infinity XQ80 leave the address and maintained surveillance of the vehicle until it arrived and parked outside the address of **PREMISES 1**, **JONES'** residence. Case agents observed **JONES** exit the white Infinity XQ80 and enter **PREMISES 1**. A few minutes later, case agents observed **JONES** exit **PREMISES 1** and enter the front passenger side of a silver Hyundai, which was parked in front of **PREMISES 1**. The silver Hyundai left the address and arrived at **PREMISES 2**. Case agents then observed **JONES** exit the silver Hyundai and enter **PREMISES 2** while the Hyundai was waiting outside. Moments later, **JONES** exited **PREMISES 2** and re-entered the silver Hyundai.

23.     Case agents conducted surveillance in the area of the buy location, the McDonald's restaurant located at 1575 W. Washington Street, and observed CS #1 arrive at the location. Case agents further observed the silver Hyundai arrive at the location of the McDonald's restaurant. Case agents observed what appeared to be two suspected hand-to-hand narcotics transactions take place, neither of which

12

involved CS #1. The first transaction involved an unknown white male who approached the passenger side of the Hyundai and conducted a hand-to-hand transaction, and the second transaction involved an unknown black male who approached the front passenger door of the Hyundai momentarily and then left on foot. Without meeting with CS #1, the silver Hyundai left the location and traveled back to **PREMISES 1**, at which time case agents observed **JONES** exit the silver Hyundai, retrieve an item from the mailbox, and re-enter the vehicle. The silver Hyundai left the area traveling east on W. National Avenue.

24.     Case agents communicated with CS #1, who indicated the transaction would be delayed about one hour or so. During this time, case agents were notified through court authorized warrants of "ping" locations for the ▮▮▮▮ Phone that **JONES** traveled south towards Chicago and was not within the Milwaukee City limits. Specifically, the 9473 Phone showed connections to towers located in the area of 16598 W. Cherrywood Lane, Wadsworth, Illinois at 3:27 p.m., and in the area of 1212 W. Grande Avenue, Chicago, Illinois at 4:09 p.m.

25.     Upon learning that **JONES** was delayed, CS #1 departed the meet location. However, while in route, CS #1 received a phone call from **JONES**, who stated he would have his brother conduct the narcotics transaction. Accordingly, CS #1 returned to the meet location and parked at address 1565 W. Scott Street facing east. **JONES** notified CS #1, via phone call and text messages that his brother would arrive shortly at the location driving a Red Monte Carlo.

13

26.     After approximately thirty minutes, at approximately 3:29 p.m., case agents observed a Red Monte Carlo drive to and park directly behind CS #1's vehicle. Case agents observed CS #1 exit the vehicle and approach the front passenger door of the Red Monte Carlo. CS #1 opened the front passenger door and reached into the vehicle. Moments later, CS #1 returned to CS #1's vehicle. Case agents observed the Red Monte Carlo leave the location going east on W. Scott Street.

27.     Case agents met with and debriefed CS #1 after the narcotics purchase from **JONES'** brother. Case agents seized the suspected heroin and the recording devices. CS #1 provided the following information. CS #1 indicated CS #1 arrived in the parking lot and attempted to contact **JONES** multiple times to notify **JONES** that CS #1 was waiting in the parking lot. CS #1 received a text message from **JONES** stating he would be there in one hour or so. CS #1 talked to **JONES** over the phone where **JONES** stated he was trying to get a hold of his brother to conduct the drug transaction and would be driving a red Chevrolet Monte Carlo. CS #1 told **JONES** where CS #1 was parked. CS #1 observed the red Chevrolet Monte Carlo arrive and park behind CS #1's vehicle. CS #1 approached the passenger door of the red Chevrolet Monte Carlo and observed **JONES'** brother in the driver seat and an unknown black male in the front passenger seat. CS #1 opened the passenger door and leaned into the vehicle. CS #1 provided **JONES'** brother the pre-recorded $4,500 in cash, and **JONES'** brother pulled a clear plastic bag containing a light

14

gray powdery/chunky-like substance and handed it to CS #1. CS #1 returned to his/her vehicle and the red Chevrolet Monte Carlo left the area.

28.     A field test revealed that the substance obtained from **JONES'** brother yielded positive results for the presence of heroin, methamphetamine, and fentanyl, and weighed approximately 51.8 grams. Audio and video of the controlled purchase was reviewed and determined to have captured only part of the transaction. A review of the existing video was determined to be consistent with CS #1's statements regarding the attempt to meet with **JONES** to conduct the narcotics transaction. Additionally, the observations made by case agents throughout the narcotics transactions with **JONES'** brother appeared to be consistent with the CS #1's statements.

### 4.     May 26, 2020, Controlled Purchase of Heroin

29.     On May 26, 2020, CS #1 arranged to purchase heroin from **JONES**. Case agents met with CS #1, who advised CS #1 had been in contact with **JONES** and indicated CS #1 would be purchasing ten grams of heroin in the future. CS #1 made a consensually recorded phone call to the ▮▮▮ Phone, and **JONES** answered the phone. CS #1 and **JONES** discussed meeting today and CS #1 asked **JONES** to meet in five minutes, which **JONES** acknowledged. CS #1 stated CS #1 didn't need to confirm the location as it was predetermined to be at McDonalds, located at 1575 W. Washington Street, Milwaukee, Wisconsin.

15

30.     Case agents provided CS #1 with a recording device and a total of $850 of pre-recorded money for the controlled purchase. Case agents established law enforcement teams for surveillance at three locations: **PREMISES 1**, **JONES'** residence; **PREMISES 2**, **JONES'** stash apartment; and McDonalds located at 1575 W. Washington Street, Milwaukee, Wisconsin.

31.     At approximately 12:20 p.m., surveillance observed **JONES** leave **PREMISES 1** and enter a gray Infiniti parked in the driveway. At approximately 12:36 p.m., and before the arrival of CS #1, surveillance observed **JONES** arrive at the McDonalds located at 1575 W. Washington Street. Surveillance observed **JONES** exit the vehicle and an unidentified white female enter the front passenger seat. **JONES** returned to the vehicle and shortly thereafter the female left the vehicle. **JONES** then left the area, and at approximately 12:40 p.m., **JONES** arrived back at **PREMISES 1**. Case agents believe that this interaction between **JONES** and the unidentified female is consistent with a drug transaction.

32.     At approximately 12:49 p.m., CS #1 arrived at the McDonalds. **JONES** was observed entering and exiting **PREMISES 1** between 12:40 p.m. and 1:06 p.m. At approximately 1:06 p.m., CS #1 contacted **JONES** at the ▆▆▆Phone, and **JONES** asked if CS #1 was at the McDonalds. S #1 confirmed, and **JONES** indicated he was on his way.

33.     At approximately 1:10 p.m., surveillance observed **JONES** enter the gray Infiniti and leave **PREMISES 1**. At approximately 1:14 p.m., surveillance

16

observed **JONES** arrive at **PREMISES 2** and enter the front door. At approximately 1:28 p.m., CS #1 contacted **JONES** at the ▓▓▓ Phone, and **JONES** told CS #1 he would be there in a few seconds. At approximately 1:34 p.m., surveillance observed **JONES** exit the front door of **PREMISES 2** and enter the gray Infiniti.

34.     At approximately 1:35 p.m., surveillance observed **JONES** arrive at the McDonalds operating the gray Infiniti. Surveillance observed CS #1 enter the front passenger seat, close the door, and then subsequently exit the vehicle. Moments after CS #1 left the vehicle, an unidentified white male entered the front passenger seat of the vehicle. Case agents believe that this interaction between **JONES** and the unidentified male is consistent with a drug transaction. At approximately 1:36 p.m., CS #2 began to leave the parking lot of the McDonalds.

35.     Case agents met and debriefed CS #1 after the narcotics purchase from **JONES**. Case agents seized the suspected heroin and the recording devices. CS #1 indicated CS #1 arrived in the parking lot and attempted to make contact with **JONES** three times and eventually received a call from **JONES**. In this call, **JONES** confirmed CS #1 was at the McDonalds and indicated he would be there shortly. After continuing to wait, CS #1 was able to contact **JONES** again, who indicated he would be there in a few seconds. CS #1 observed a gray Infiniti arrive at the location, at which time CS #1 entered the front passenger seat. CS #1 observed **JONES** was the driver and the sole occupant of the vehicle. CS #1

17

observed approximately 10 grams of heroin on **JONES'** lap. CS #1 also observed a large clear sandwich bag containing approximately 30 grams of heroin individually packaged in small amounts on the driver's seat tucked near **JONES'** groin area. **JONES** handed CS #1 the narcotics as CS #1 provided the money to **JONES**. CS #1 exited the vehicle and believed another narcotics transaction was about to occur with a white male. CS #1 indicated **JONES** frequently "lines up" multiple customers at one time.

36.     Case agents field tested the suspected heroin, which yielded positive results for the presence of heroin, fentanyl, and methamphetamine, and weighed approximately 10 grams. A case agent reviewed the video of the narcotics transaction and determined it was consistent with CS #1's statements regarding the narcotics transaction.

### 5.     July 8, 2020, Controlled Purchase of Heroin

37.     On July 8, 2020, CS #1 arranged to purchase heroin from **JONES**. Case agents met with CS #1, who advised CS #1 had been in contact with **JONES** and indicated CS #1 would be purchasing ten grams of heroin in the future. CS #1 made a consensually recorded phone call to the ▮▮▮ Phone, and **JONES** answered the phone. CS #1 and **JONES** discussed meeting, and **JONES** told CS #1 to meet at McDonalds, which is known to CS #1 to be the McDonald's located at 1575 W. Washington Street, Milwaukee, Wisconsin.  CS #1 made a second consensually recorded phone call to the ▮▮▮ Phone, and **JONES** answered the phone.  CS #1

18

asked **JONES** how far away **JONES** was, and **JONES** replied that he was a couple of minutes out. **JONES** then confirmed that CS #1 wanted "ten," known to CS #1 to be ten grams of heroin.

38.     Case agents provided CS #1 with a recording device and a total of $700 of pre-recorded money for the controlled purchase. Case agents established law enforcement teams for surveillance at three locations: **PREMISES 1, JONES'** residence; **PREMISES 2, JONES'** apartment; and McDonalds located at 1575 W. Washington Street, Milwaukee, Wisconsin.

39.     At approximately 4:46 p.m., case agents observed a white Dodge Caravan with Colorado registration plates AZFE20 park in a lot to the west of **PREMISES 2**. Within a minute, case agents observed **JONES**, wearing a black short sleeve shirt, black and gray shorts, and black shoes, exit the driver door of the white Dodge Caravan. Case agents observed **JONES** walk in the direction of the rear entrance door of **PREMISES 2**. However, agents were not in position to see the rear door. At approximately 5:02 p.m., case agents, who had repositioned themselves, observed **JONES** exit the rear door of **PREMISES 2**. Case agents observed **JONES**, wearing a white and red backpack strapped on his back, walk to the white Dodge Caravan, open the driver door, remove the backpack, and place the backpack inside the vehicle. Then, case agents observed **JONES** enter the white Dodge Caravan and drive southbound through the parking lot, east on W. Orchard Street, and then north on S. 15th Street.

19

40.     At approximately 5:07 p.m., CS #1 arrived at the McDonalds.  Case agents observed CS #1 exit CS #1's vehicle, walk towards **JONES'** white Dodge Caravan, and enter the front passenger seat.  At approximately 5:09 p.m., case agents observed **JONES** exit the white Dodge Caravan, get back in CS #1's vehicle, and leave the area.  Simultaneously, case agents observed the white Dodge Caravan traveling west on W. Scott Street and then north onto S. Cesar E. Chavez Drive.  Case agents in the area positively identified the driver of the white Dodge Caravan as **JONES**.

41.     At approximately 5:12 p.m., case agents observed the white Dodge Caravan stop in front of the **PREMISES 1** momentarily before driving to a nearby gas station, where **JONES** filled up with gas. **JONES** then momentarily stopped in the parking lot of the Popeyes located at 1567 W. National Avenue. At approximately 5:24 p.m., case agents observed the Dodge Caravan parked in the driveway of **PREMISES 1**.

42.     At approximately 5:28 p.m., case agents met and debriefed CS #1 after the narcotics purchase from **JONES**.  Case agents seized the suspected heroin and the recording devices. CS #1 indicated CS #1 drove to the McDonalds located at 1575 W. Washington Street and parked on the south side of the street, south of the McDonalds parking lot.  CS #1 stated **JONES** called CS #1 as CS #1 arrived and asked where CS #1 was parked.  CS #1 told **JONES** CS #1 was parked on the street and not in the McDonalds parking lot.  CS #1 stated **JONES** arrived in a white van

20

on the north side of the street. CS #1 exited CS #1's vehicle and entered the front passenger seat of the van. CS #1 stated **JONES** already had the suspected narcotics in his hand and provided it to CS #1. CS #1 provided **JONES** with the $700 in pre-recorded cash. CS #1 stated CS #1 exited the van and re-entered CS #1's vehicle.

43.     Case agents field tested the suspected heroin, which yielded positive results for the presence of heroin and fentanyl, and weighed approximately 10 grams. A case agent reviewed the video of the narcotics transaction and determined it was consistent with CS #1's statements regarding the narcotics transaction.

### C.     Confidential Source #2

44.     On March 5, 2020, case agents conducted surveillance of **JONES** at **PREMISES 1**. Case agents have observed **JONES** at this residence frequently. On this date, case agents observed **JONES** exit **PREMISES 1** and enter a red Chevrolet Camaro bearing Michigan plate DRW6101. Case agents surveilled **JONES** as he met with an individual in the parking lot of an IHOP Restaurant located at 1110 Miller Park Way, Milwaukee, Wisconsin. Case agents observed the male at the driver's side window speaking to **JONES** and then walk away from the vehicle holding a bag. Case agents located the individual in a McDonald's located next to the IHOP Restaurant. The individual went to the restroom for approximately 45 minutes, leading case agents to believe the individual was involved in suspicious activity. Once the individual left McDonald's, the Milwaukee

21

Police Department conducted a field interview of the individual. The individual was identified and later determined to be CS #2. During the interview, CS #2 admitted to having a quantity of heroin inside the backpack that CS #2 had just purchased. Located inside the backpack was, among other items, a small clear plastic container with suspected heroin. CS #2 was arrested by Milwaukee Police Department for possession of narcotics.

45. CS #2 was transported to a Milwaukee Police Department District. CS #2 waived CS #2's *Miranda* rights and provided the following information. CS #2 admitted to buying heroin from an individual CS #2 knows as "R.J." before being stopped by the police. CS #2 contacted R.J. via ████████ the ██ Phone, and arranged to meet to purchase a quantity of heroin at the McDonald's located on Miller Parkway. R.J. arrived in a red Chevrolet Camaro and there was an unknown female in the passenger seat. CS #2 gave R.J. $140 for approximately one gram of heroin. CS #2 believed CS #2 has purchased heroin from R.J. on three dozen occasions, usually in the amount of one gram per transaction. CS #2 indicated R.J. is known to operate multiple vehicles during drug transactions, including the red Camaro.

---

[2] Phone number ████████ is subscribed to MACK MAN with address ████████ ████████ However, based on the investigation, case agents believe JONES is the user of this phone.

22

46.     A case agent showed a single Milwaukee Police Department booking photograph of **JEFFREY R. JONES**, a/k/a **JEFFERY JONES**, (date of birth: XX/XX/1984) to CS #2. CS #2 positively identified the photograph as the person CS #2 knew as "R.J."

47.     On March 19, 2020, case agents interviewed CS #2. CS #2 indicated that, in March 2019, R.J. approached CS #2 about starting a marijuana grow operation for R.J. R.J. inquired about the ability to obtain a large quantity of marijuana, between 50 and 100 pounds, from Colorado. R.J. discussed chartering a plane for the transportation of the marijuana from Colorado to Wisconsin. R.J. indicated his cousin in Illinois would be the one that would most likely run the operation. CS #2 further stated that CS #2 has previously purchased heroin from R.J. using the ▮▮▮▮ Phone.

48.     Case agents believe CS #2 is reliable and credible. First, CS #2 has provided information and cooperated with law enforcement since March 2020. Second, CS #2's information comes from CS #2's personal involvement with **JONES** and is consistent with case agent's knowledge of **JONES** and **JONES'** narcotics trafficking activities in Milwaukee, Wisconsin. CS #2's information about CS #2's trafficking relationship is also corroborated by the controlled buys that CS #1 conducted with **JONES**. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

For these reasons, case agents believe CS #2 to be reliable.

49.    On April 8, 2020, CS #2 conducted a consensually recorded phone call to discuss a future narcotics transaction with **JONES**. CS #2 made a consensually recorded phone call to the ▮▮▮ Phone, and **JONES** answered the phone. CS #2 asks **JONES** if he is still serving during the pandemic, and **JONES** says he has been waiting for CS #2 to call. CS #2 indicated that CS #2 wanted a "whole," referring to one gram of heroin. **JONES** says alright and provides a location to meet.

50.    Case agents debriefed CS #2 after the consensually recorded phone call with **JONES**. CS #2 stated CS #2 usually buys one-half of a gram or one gram of heroin from **JONES** at a time and pays $140 for one gram of heroin. CS #2 stated CS #2 did not think **JONES** would actually deliver the narcotics. Case agents believe **JONES** would not drive to the location to conduct the narcotics transaction due to it being located outside of Milwaukee County. The controlled buy for one gram of heroin did not subsequently occur.

### D.    Identification of PREMISES 2 as JONES' Stash Apartment

51.    On April 26, 2020, case agents conducted surveillance at the intersection of S. 8th Street and W. Greenfield Avenue in Milwaukee, Wisconsin with the assistance of the court-authorized location data. Pursuant to court-

24

authorized location information for the ▓▓ Phone, case agents received notice that the ▓▓ Phone was in the area of 916-918 W. Greenfield Avenue. Case agents observed a red convertible Chevrolet Camaro parked in the lot of a multi-unit apartment complex located at ▓▓▓▓▓▓▓▓▓▓ **PREMISES 2**, and identified **JONES** enter the vehicle and drive northbound on S. 15th Street towards W. Greenfield Avenue.

52.   On April 27, 2020, case agents conducted surveillance at **PREMISES 2**. At approximately 11:20 a.m., case agents were notified through court-authorized warrants of "ping" locations for the ▓▓ Phone, that the ▓▓ hone was in the vicinity of 1500-1550 W. National Avenue, which is near **PREMISES 1**. Between approximately 11:36 a.m. and 4:52 p.m., agents received updates of the court-authorized warrants of "ping" locations for the ▓▓ hone, which showed southbound travel from Milwaukee, Wisconsin to a location near 5400 Southport Road in Portage, Indiana. The ▓▓ Phone then appeared to travel back to Milwaukee. Additionally, during this time, the ▓▓ Phone, showed connections to towers located in the area of 2720 S. 11th Street, Milwaukee, Wisconsin at 11:30 a.m., in the area of 556-562 Broadway, Gary, Indiana at 2:45 p.m., in the area of 13433 Three Oaks Road, Chikaming Township, Michigan at 4:17 p.m., in the area of 7405 S. Stony Island Avenue, Chicago, Illinois at 5:26 p.m., and in the area of 226 N. 33rd Street, Milwaukee, Wisconsin at 7:15 p.m.

25

53.     At approximately 7:22 p.m., which was about two hours and thirty minutes after the ▆▆ Phone's positional data indicated it was located in Portage, Indiana, case agents received an updated "ping" near location ▆▆▆▆▆▆ ▆▆▆▆▆▆ in Milwaukee, Wisconsin. At approximately 7:35 p.m., case agents observed a red Chevrolet Camaro make a U-turn and park in front of **PREMISES 2**. Case agents observed **JONES** exit the driver side of the red Chevrolet Camaro and retrieve a black duffle bag from inside the red Chevrolet Camaro. Based upon the way in which the bag drooped down **JONES'** back, the duffle bag appeared heavy. **JONES** then entered the front door **PREMISES 2**.

54.     Within minutes, case agents observed the lights go on in the apartment located in the northwest corner of the top floor. While conducting the surveillance, case agents did not observe any activity in this apartment until **JONES** arrived. Within the window of the apartment that **JONES** entered, case agents observed a camera, which is facing and overlooking the entry of the parking lot, as depicted below.

26



55.     After approximately twenty minutes, case agents observed **JONES** exit the front entry door of address **PREMISES 2**, enter the red Chevrolet Camaro, and drive westbound on W. Orchard Street towards 15th Place. Case agents observed the red Chevrolet Camaro had illegal aftermarket tint applied to the window, and the visors inside the vehicle were flipped down.

56.     In an attempt to confirm which apartment **JONES** is using at **PREMISES 2**, case agents located a Milwaukee Police Department police call record for a welfare check at ████████████████████████████ on November 21, 2019. Officers that responded to this location were wearing body cameras, and case agents reviewed the footage. The footage tracks the officers' movements through two locked entry doors, up a staircase until they reach the third and top floor, north down a hallway, and stop in front of ████████ which is located in the northwest corner of the building on the top floor. There appears to be

27

a "Ring" style video camera doorbell next to the entryway to ████████████.
Officers spoke with an individual identified as Kathy Jones (dob: XX/XX/1968).
Review of the body camera footage confirmed ████████ as being the same
apartment that was observed having a light turned on shortly after **JONES** arrived
to and deposited a large duffel bag in the apartment complex on April 27, 2020.

57.     Based on training, experience, and knowledge of this investigation,
case agents believe that **JONES** traveled to Portage, Indiana to obtain controlled
substances. The ████ nd ████ Phones showed travel to that location, where
**JONES** stayed for only a short period of time. **JONES** then drove to **PREMISES 2**,
where agents believe **JONES** is using ████████ as a stash location.
Consistent with the belief that this is a stash location, **JONES** carried a large bag
into the apartment, stayed for a short period of time, then left without the bag that
he carried in. Furthermore, **JONES** was operating a vehicle with aftermarket tint
and the visors flipped down, which are activities commonly used by drug traffickers
to conceal their identities.

**E.     PREMISES 1,** ████████████████

58.     On June 4, 2020, a case agent conducted an Accurint database search
for **JONES**. Accurint showed a residence for **JONES** as **PREMISES 1** from March
2017, to October 2019.

59.     On June 4, 2020, a case agent conducted a City of Milwaukee property records check for **PREMISES 1**. The record showed J PACIFIC VENTURES LLC as the owner.

60.     On July 15, 2020, case agents conducted a utility check for **PREMISES 1**. The utilities check indicated Dequanna M. Bostick AKA Gilbert was listed on the account for the residence.

**F.    PREMISES 2,** ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

61.     On June 4, 2020, a case agent conducted an Accurint database check, which showed **PREMISES 2** as one address for Kathy Jones between August 2018, and May 2020. Accurint also provided ▅▅▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅▅ as an address for Kathy Jones for the same time period.

a.     On June 4, 2020, a case agent conducted toll analysis for telephone number ▅▅▅▅▅▅ which was obtained as a phone number from a utilities check in relation to Kathy Jones. The number believed to be used by Kathy Jones was in contact with the ▅▅Phone approximately 185 times and the ▅▅ Phone approximately 3 times. Based on this information, as well as additional information acquired through this investigation, case agents believe Kathy Jones is a family member to **JONES**.

62.     On June 4, 2020, a case agent conducted a City of Milwaukee property records check for **PREMISES 2**. The record showed PMWF ORCHARD LLC as the owner of ▅▅▅▅▅▅▅▅

29

63.     On July 15, 2020, case agents conducted a utility check for

**PREMISES 2**. The utilities check indicated Kathy Jones was listed on the account

for the apartment.

### G.     Telephone Location Information Reflects JONES Continues to Travel Out-of-State to Obtain Controlled Substances

66.     On June 14, 2020, between approximately 5:02 p.m. and 10:14 p.m.,

agents received updates of the court-authorized warrants of "ping" locations for **the**

███ Phone, which showed southbound travel from Milwaukee, Wisconsin to a

location near 52590 Evergreen Road, Granger, Indiana. Shortly after arriving to

Indiana, the ███ Phone then appeared to travel back to Milwaukee. Additionally,

the ███ Phone showed connections to towers located in the area of 16598 W.

Cherrywood Lane, Wadsworth, Illinois at approximately 6:24 p.m., in the area of

3497 N. US Highway 35, La Porte, Indiana at approximately 7:57 p.m., in the area

of 6502 Grape Road, Mishawaka, Indiana at approximately 8:22 p.m., in the area of

3526 Keller Street, South Bend, Indiana at approximately 9:04 p.m., in the area of

5000 Central Avenue, Lake Station, Indiana at approximately 9:52 p.m., in the area

of 4401 E. 13th Place, Gary, Indiana at approximately 9:53 p.m., and in the area of

3120 S. Wentworth Avenue, Chicago, Illinois at approximately 10:20 p.m. Based

upon my training, experience, and knowledge of this investigation, to include the

short duration of this trip, I believe that **JONES** traveled to Indiana to facilitate his

drug trafficking. More specifically, case agents believe that **JONES** traveled to

meet with a narcotics supplier.

30

67.     On June 21, 2020, between approximately 12:35 a.m. and 7:10 a.m., agents received updates of the court-authorized warrants of "ping" locations for the ▇▇ Phone, which showed southbound travel from Milwaukee, Wisconsin to a location near 16689 Bakertown Road, Buchanan, Michigan. Shortly after arriving to Michigan, then ▇▇ Phone then appeared to travel back to Milwaukee. Additionally, the ▇▇ Phone, showed connections to towers located in the area of 756 N. Goldring Road, La Porte, Indiana at approximately 4:12 a.m. and in the area of 52369 Primrose Road, South Bend, Indiana at approximately 5:36 a.m. Based upon my training, experience, and knowledge of this investigation, to include the short duration of this trip, I believe that **JONES** traveled to Michigan to facilitate his drug trafficking. More specifically, case agents believe that **JONES** traveled to meet with a narcotics supplier.

## TECHNICAL TERMS

64.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet

31

service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

c.     Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

71.    As described above and in Attachment B, this application seeks permission to search for records that might be found on **PREMISES 1** and **2**, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

72.    *Probable cause.* I submit that if a computer, cellular telephone, or storage medium is found on **PREMISES 1** and **2**, there is probable cause to believe

32

those records will be stored on that computer or storage medium, for at least the following reasons:

        a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

        b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

        c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users

33

typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

73.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in **PREMISES 1** and **2** because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record

34

information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such

35

information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

        c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw

36

conclusions about how computers were used, the purpose of their use, who used them, and when.

        d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

        f.      I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is

37

also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

74.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic

electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

        b.     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

        c.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

        75.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the

media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

76.     It is possible that **PREMISES 1** and **2** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

77.     Based on the facts contained within this affidavit, I believe there is probable cause to believe that **JEFFREY R. JONES**, a/k/a **JEFFERY JONES**, committed the crimes of distribution of controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

78.     Based upon the facts contained within this affidavit I believe there is probable cause for a warrant to search **PREMISES 1** and **2** described in Attachment A and seize the items described in Attachment B.

40